# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **PATRICK J. MAHONEY,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 22-760 (JEB)** |
| **UNITED STATES CAPITOL POLICE BOARD,** *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

There is no denying Plaintiff Patrick J. Mahoney's persistence. Over the years, he has brought lawsuits seeking Court authority to conduct various religious activities on restricted federal grounds. This time around, he wishes to hold a large prayer vigil in an area of the U.S. Capitol Grounds that is forbidden to groups of 20 or more unless sponsored by a Member of Congress.

Just over a month ago, this Court granted in part and denied in part the Government's Motion to Dismiss a separate lawsuit he had filed. Mahoney, a clergyman, brought that action after the Government denied his permit application to hold a large prayer vigil on the West Front Lawn of the Capitol on September 11, 2021. Defendants in that case, the U.S. Capitol Police Board and certain individuals associated with the Board, denied his application because the area was still closed to demonstrations in the wake of the January 6, 2021, attack on the Capitol. They later clarified that Plaintiff could go forward as long as his vigil attracted fewer than 20 people, or he could hold a larger vigil in an immediately adjacent area still on the Capitol

Grounds.  In the Court's prior Opinion, it dismissed four counts of the Amended Complaint and allowed two to proceed to discovery.

Seeking to shore up potential shortcomings in his prior action, Mahoney has filed a new, highly similar lawsuit — which relies on assorted constitutional provisions — in the hopes of holding a similar prayer vigil on the West Front Lawn on Good Friday, which is April 15, 2022. In winter 2022 he applied for a permit to hold such a vigil, which the Board denied because the West Front Lawn remained off limits to demonstrations of 20 or more.  He now moves for a preliminary injunction requiring the Board to grant him the permit.  Because he has not established a likelihood of success on the merits, the Court will deny his Motion.

I.     **Background**

As the Court recounted at length the relevant background in its previous Opinion in Plaintiff's other case, it provides here only a brief overview that relates to the current dispute. See Mahoney v. U.S. Capitol Police Bd. (Mahoney I), No. 21-2314, 2022 WL 523009, at *1–3 (D.D.C. Feb. 22, 2022).  In that case, Mahoney was seeking damages for being denied a permit in September 2021, as well as declaratory and injunctive relief for future prayer vigils.

The Court's Opinion granted the Government's Motion to Dismiss four of the six claims in the Amended Complaint.  More specifically, it jettisoned Mahoney's free-speech claim, which encompassed both facial and as-applied causes of action, his claim under the Free Exercise Clause, his challenge pursuant to the Religious Freedom Restoration Act, and his due-process cause of action.  Id. at *4–7, 10–14.  The Court held, however, that Plaintiff had stated a plausible claim for relief on his selective-enforcement claim brought pursuant to the Equal Protection Clause, as well as on his freedom-of-association claim under the First Amendment.

2

Id. at *7–9.  It also clarified that although Mahoney could not obtain damages on his remaining

constitutional counts, he could pursue declaratory and injunctive relief.  Id. at *14.

While Defendants' Motion to Dismiss was pending, Plaintiff applied for a permit to hold

a vigil this Good Friday on the West Front Lawn, to which he anticipated attracting

approximately 25 people.  See ECF No. 1 (Complaint), ¶¶ 45–46.  The Board denied his

application on February 3 because Area 1 of the Capitol Grounds, which encompasses the West

Front Lawn, "remain[s] temporarily restricted to demonstration groups of 20 or more."  ECF No.

11-1 (Declaration of Scott Grossi), ¶ 14.  The relevant Board rules explain that "[n]o group of

twenty (20) persons or more shall engage in demonstration activity on Capitol Grounds except

pursuant to the terms of a permit issued by the Capitol Police Board," ECF No. 2-3 (Traffic

Regulations for the U.S. Capitol Grounds), § 12.4.10, and the Board has made clear that it "can

only process permit requests for demonstrations or organized activity involving more than 19

people in non-restricted or non-prohibited areas."  Grossi Decl., ¶ 16.  Mahoney attests that he

still wishes to hold a large prayer vigil on Good Friday.  See Compl., ¶ 49; see ECF No. 2-2

(Declaration of Patrick J. Mahoney), ¶¶ 19–21.  He thus filed a motion for preliminary injunction

in case no. 21-2314 asking the Court to require Defendants to grant him a permit.  See Case No.

21-2314, ECF No. 20.

On March 21, however — less than a month before Good Friday and on the day his reply

brief was due — Plaintiff withdrew his request for a preliminary injunction and instead filed a

new lawsuit and accompanying Motion for Preliminary Injunction.  See Case No. 21-2314, ECF

No. 32 (Notice of Withdrawal of Motion); Case No. 22-760, ECF No. 2-1 (PI Motion).  The new

lawsuit names the same Defendants as before, and his Motion seeks "a preliminary injunction

that prohibits the United States Capitol Police Board . . . from denying him a permit to hold a

prayer vigil attended by twenty-five people on the West Front Lawn on Good Friday of this year." PI Motion at 1. The Court assumes that this litigation strategy was meant to remedy weaknesses pointed out by Defendants in their Opposition to the earlier PI Motion. See Case No. 21-2314, ECF No. 30. (First Gov. Opp.).

In any event, the Government, with the Court's permission, has now submitted an Opposition in this case that "incorporate[s] by reference" its earlier filed Opposition. See ECF No. 11 (Second Gov. Opp.) at 1; Minute Order of March 22, 2022. Defendants also attached to each Opposition a declaration by Scott Grossi, the Special Events Section Commander for the United States Capitol Police, which describes the permitting process that the USCP uses. See Grossi Decl.

## II.   Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (alterations in original) (quoting Winter, 555 U.S. at 20). "The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted." Hospitality Staffing Solutions, LLC v. Reyes, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Historically, these factors have "been evaluated on a 'sliding scale.'" Davis v. Pension Ben. Guar. Corp., 571 F.3d 1288, 1291 (D.C. Cir. 2009) (quoting Davenport v. Int'l Bhd. of

Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)).  In other words, if the movant makes an "unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." Id. at 1291–92.  This Circuit has hinted, though not held, that Winter — which overturned the Ninth Circuit's "possibility of irreparable harm" standard — establishes that "likelihood of irreparable harm" and "likelihood of success" are "'independent, free-standing requirement[s].'" Sherley, 644 F.3d at 392–93 (quoting Davis, 571 F.3d at 1296 (Kavanaugh, J., concurring)); see League of Women Voters v. Newby, 838 F.3d 1, 7 (D.C. Cir. 2016) (declining to address whether "sliding scale" approach is valid after Winter).  At any rate, our Circuit has held that a failure to demonstrate a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion.  See Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric., 573 F.3d 815, 832 (D.C. Cir. 2009).

## III.     Analysis

In his initial lawsuit, Plaintiff claimed that Defendants' denial of his September 11 permit offended numerous constitutional provisions, as well as RFRA.  See Mahoney I, 2022 WL 523009, at *4.  As mentioned, however, the Court dismissed most of those counts in its earlier Opinion, leaving only Fifth Amendment selective-enforcement and First Amendment freedom-of-assembly counts.  Mahoney's new suit and Motion offload much that was dismissed and focus on the Equal Protection Clause, although for some reason they still rely on a First Amendment as-applied challenge as well.  See PI Motion at 9.  More specifically, he contends that the Traffic Regulations are not narrowly tailored, that the Board did not apply the regulations in a neutral manner, and that the denial of Plaintiff's permit constituted impermissible selective enforcement under the Equal Protection Clause.  See PI Motion at 10, 15, 18.  Plaintiff also adds in a footnote

that he is "likely to success [*sic*] on his claims for violation of his rights to association and assembly." Id. at 17 n.3.

Although the Government spent much time on selective enforcement in its PI Opposition in the original case, it makes a somewhat odd tactical choice in the newly filed case. More specifically, it spills much ink on reiterating that the denial of Mahoney's permit application reflects a narrowly tailored restriction under the First Amendment — a position nearly identical to one the Court already agreed with in its prior Opinion. See Second Gov. Opp. at 6–10; Mahoney I, 2022 WL 523009, at *4–6. That issue is thus no longer live. Defendants, meanwhile, neglect entirely to address the selective-enforcement claim. See Second Gov. Opp. at 5–12. Because they did discuss that issue in their first Opposition, however, and expressly incorporated that brief here, their arguments concerning selective enforcement are properly presented. Id. at 1; see First Gov. Opp. at 9–14.

In the analysis that follows, the Court will primarily address Mahoney's selective-enforcement claim before briefly taking up his freedom-of-assembly challenge and irreparable harm. As just mentioned, and despite Plaintiff's focus in his Reply, the Court will not relitigate his First Amendment arguments that the Traffic Regulations are not narrowly tailored and that the Board inconsistently enforced them, given that it already discussed at length and dismissed essentially identical arguments in its prior Opinion. See Mahoney I, 2022 WL 523009, at *4–7. With respect to narrow tailoring, the Court rejected the same argument in the context of Plaintiff's facial First Amendment challenge, and he does not provide any compelling reason why the analysis should be different here. Id. at *4–6. Indeed, nowhere does Mahoney even acknowledge the existence of the earlier Opinion, much less attempt to distinguish it. As for his argument that the Government did not enforce the regulations in a uniform manner, the Court

previously explained why such a claim is better analyzed as a selective-enforcement claim under the Equal Protection Clause, in which context it will examine the issue here.  See Mahoney I, 2022 WL 523009, at *7 (citing Frederick Douglass Found., Inc. v. D.C., No. 20-3346, 2021 WL 3912119, at *4–10 (D.D.C. Sept. 1, 2021)).  It will otherwise rest on its prior Opinion to conclude that Plaintiff has not demonstrated a likelihood of success on the merits of his First Amendment claims.  To the extent that Mahoney wishes the Court to reconsider that prior decision, the proper vehicle for raising such arguments is a Motion for Reconsideration, which he has separately filed and the Court will analyze in due course.  See Case No. 21-2314, ECF No. 26.

    A.  Likelihood of Success on the Merits

        1.  *Selective Enforcement*

Mahoney's selective-enforcement claim boils down to this: it was unconstitutional for the Board to deny his permit application to host a demonstration with 20 or more people on the West Front Lawn while refusing to enforce the same restrictions against Members of Congress.  See PI Motion at 18–21.  The Government counters that he was not similarly situated to those allowed to host such demonstrations, that he was treated the same as those who were similarly situated, and that his permit denial was not improperly motivated.  See First Gov. Opp. at 9–14.  The Court concurs.

"When determining whether the [Equal Protection] Clause has been violated because of selective enforcement or prosecution, plaintiffs must establish two factors: 'that (1) [they were] singled out for prosecution from among others similarly situated and (2) that [the] prosecution was improperly motivated, *i.e.*, based on race, religion or another arbitrary classification.'" Frederick Douglass Found., Inc., 2021 WL 3912119, at *7 (quoting Branch Ministries v.

Rossotti, 211 F.3d 137, 144 (D.C. Cir. 2000)); see also Wandering Dago, Inc. v. Destito, 879

F.3d 20, 40 (2d Cir. 2018) (applying similar test in selective-enforcement claim based on

viewpoint discrimination); Mahoney I, 2022 WL 523009, at *8.  The Court addresses the two

requirements in order.

Parties are "'similarly situated' for purposes of a selective enforcement claim 'when their

circumstances present no distinguishable legitimate prosecutorial factors that might justify

making different prosecutorial decisions with respect to them.'"  United States v. AT&T Inc.,

290 F. Supp. 3d 1, 4 (D.D.C. 2018) (quoting Branch Ministries, 211 F.3d at 145); see Frederick

Douglass Found., Inc., 2021 WL 3912119, at *7.  In its prior Opinion — at the motion-to-

dismiss stage — the Court held that Mahoney had "plausibly alleged that the Board enforced the

Traffic Regulations against him differently than against others similarly situated."  Mahoney I,

2022 WL 523009, at *8.  In denying the Government's Motion as to selective enforcement, it

reasoned that, taking the Amended Complaint as true and not looking to outside materials,

Plaintiff had sufficiently alleged that "the Board allowed three large demonstrations to go

forward in late summer 2021 on or around the West Front Lawn, while it denied Mahoney's

application to do the same."  Id.  Critical to that conclusion, however, was the Court's declining

to take judicial notice of the Government's proffered reason for approving the three large

demonstrations — i.e., "[t]hose demonstrations were not subject to the Traffic Regulations

because they were sponsored or requested by Members of Congress."  Id.  Such rationale could

not be considered because it was "premised on facts not alleged in the Amended Complaint."  Id.

As the issue now arrives clothed in different legal raiment — viz., a PI motion, rather

than a motion to dismiss — the Court may look outside the Amended Complaint, particularly at

the Grossi Declaration.  There, Grossi acknowledges that several large demonstrations went

forward on the West Front Lawn and on the Eastern Steps of the Capitol, but explains that they were allowed only because they were sponsored or organized by Members of Congress.  See Grossi Decl., ¶¶ 24–29.  He points out: "[E]vents sponsored or organized by Members of Congress are not subject to the rules regarding demonstrations on Capitol Grounds."  Id., ¶ 26. Plaintiff, meanwhile, does not seriously dispute the veracity of this proffered rationale.  See PI Motion at 18–20.  Instead, he argues that this practice is repugnant to the Constitution because Members and Plaintiff should be regarded as similarly situated.  Id.  The Court disagrees.

Members of Congress sponsoring or organizing demonstrations on the Capitol Grounds present "distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."  AT&T Inc., 290 F. Supp. 3d at 4 (quoting Branch Ministries, 211 F.3d at 145).  Consider the numerous ways in which Members are different from non-Members while on the Capitol Grounds.  In such a setting, for instance, the Member is at her workplace, she enjoys private access to many areas that are otherwise restricted, and she is carrying out her unique constitutional duties as a legislator and representative of her constituents. Numerous legal principles recognize this reality and accord Members unique status while on the Capitol Grounds.

For instance, a statute governing unlawful activities on the Capitol Grounds — which prohibits, for example, engaging in disruptive or disorderly conduct and carrying firearms on the Grounds — explicitly exempts Members of Congress from its coverage.  See 40 U.S.C. § 5104(e)(3).  With regard to the Traffic Regulations, the D.C. Circuit held that it was reasonable for the Capitol Police to believe that the regulations simply do not apply to Members.  See Kroll v. U.S. Capitol Police, 847 F.2d 899, 902–03 (D.C. Cir. 1988).  While Kroll addressed the issue in the context of ruling on whether Capitol Police officers were entitled to qualified immunity

and therefore had no occasion to definitively resolve whether Members are in fact exempt from the regulations, the Court of Appeals did not question the constitutionality of such a regime.  Id. On the contrary, the panel reached its conclusion after observing "the oddity of having the United States Senate 'apply' for a permit from its own Police Board."  Id. at 902.  The D.C. Circuit further observed that the Capitol Police Board's permit system "by its nature applies to those outside the Capitol Hill community of Members of Congress (and their staffs)."  Id. at 903 (emphasis added).  Slightly further afield from the Traffic Regulations, the Speech or Debate Clause of the Constitution, which the Supreme Court has read "broadly," Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 501 (1975), insulates Members from liability involving all "legislative acts," which "are those 'generally done in a session of the House by one of its members in relation to the business before it.'"  McCarthy v. Pelosi, 5 F.4th 34, 39 (D.C. Cir. 2021), cert. denied, 142 S. Ct. 897 (2022) (quoting Kilbourn v. Thompson, 103 U.S. 168, 204 (1880)).

To be sure, the above authorities do not squarely hold that it is permissible for the Board to deny permits to non-Members seeking to hold large demonstrations on the West Front Lawn while declining to enforce the same rules against Members of Congress.  They do fortify, however, the intuitive notion that there are legitimate reasons to view Members as different in relevant ways when enforcing the regulations concerning demonstrations at the Capitol.  In addition to being responsible at some level for the Board and its regulations, Members of Congress are routinely and uncontroversially treated differently from the general public while they are present on the Capitol Grounds.  That is not to say that Members are above the law at the Capitol or that they enjoy a similar legal status away from the shelter of the dome, but those issues are not presented here.  Rather, the Court concludes merely that, while on the Capitol

Grounds, there are "legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to" Members of Congress.  AT&T Inc., 290 F. Supp. 3d at 4 (quoting Branch Ministries, 211 F.3d at 145).

Plaintiff resists this conclusion, contending that "[e]vents that are sponsored or requested by Members of Congress are no different with respect to the Government's asserted interest under the Traffic Regulations — security — than events sponsored or requested by other ordinary Americans."  PI Motion at 18.  While the argument has some superficial appeal, it does not withstand scrutiny.  Mahoney himself admits that "the Board may reasonably assume that Members of Congress themselves are unlikely to present a security threat to the Capitol Grounds."  Id. (emphasis omitted).  And while he questions whether a similar assumption is warranted with regard to attendees of a demonstration organized or sponsored by Members, it is reasonable to think that Members have approved the parameters of an event they sponsor and implicitly invite the attendees.  Indeed, bolstering that notion, Grossi explained that at one of the permitted demonstrations, which was held on the East Steps of the Capitol and sponsored by Congresswoman Cori Bush and attended by other Members, once "the attendance of these Members ceased, the remaining demonstrators were told they were in violation of the demonstration rules and given appropriate warnings."  Grossi Decl., ¶¶ 28–29.

Having concluded that Plaintiff is not similarly situated to the Members of Congress who organize or sponsor large demonstrations on the West Front Lawn, the Court could end its analysis.  It will nonetheless briefly explain why he has also not established a likelihood of success on the second prong of a selective-enforcement claim: showing that the "prosecution was improperly motivated, i.e., based on race, religion or another arbitrary classification."  Frederick Douglass Found., Inc., 2021 WL 3912119, at *7 (quoting Branch Ministries, 211 F.3d at 144).

Insofar as Plaintiff argues that any alleged improper motivation stems from an arbitrary distinction between Members and non-Members, the above analysis applies with equal force — *viz.*, the distinction is not arbitrary because exempting Members from the restriction on large demonstrations in certain areas of the Capitol Grounds is solidly based.  And aside from that legitimate differentiation, Mahoney has not established that the Board's denial of his permit application discriminated on an otherwise impermissible basis.

The Government's treatment of other would-be demonstrators confirms that its application of the regulations to Mahoney was not improperly motivated.  There is no genuine dispute that, in summer 2021, all applicants not sponsored by Members of Congress seeking to hold demonstrations with more than 19 people on the West Front Lawn were not granted a permit.  See Case No. 21-2314, ECF No. 30-1 (Grossi Decl. of March 16, 2022), ¶ 17.  These unsuccessful applicants represented a range of political groups hoping to speak on a number of different topics, yet none of them was allowed to hold a large demonstration because they were not organized or sponsored by a Member.  Id.  Any lingering doubt about whether the Board's decision was based on anything other than Mahoney's status as a non-Member is further allayed by Grossi's explanation that the Board began enforcing the regulations as to Congresswoman Bush's demonstration on the Eastern Steps as soon as the Members were no longer present.  See Grossi Decl., ¶¶ 28–29.

In short, Plaintiff has not established that he is likely to succeed on the merits of his claim that Defendants violated the Equal Protection Clause by selectively enforcing the Traffic Regulations against him.

2. *Freedom of Assembly*

Mahoney's sole remaining claim is that Defendants violated his constitutional right to assembly.  See PI Motion at 17 n.3.  In its prior Opinion, the Court noted that "[t]he precise contours of the claim are not terribly clear, as both parties treat it as a corollary of the [selective-enforcement] claim previously discussed and address the issue only in a footnote."  Mahoney I, 2022 WL 523009, at *9.  It declined to dismiss the claim, however, on the ground that the parties agreed that the claim "should rise and fall" with Mahoney's selective-enforcement count.  Id.

Here, the Court is left in the same position as before: Plaintiff addresses the count only in a footnote and concurs that its fate should be dictated by that of his other claim.  See PI Motion at 17 n.3.  As they rose together in the last round, so do they fall together in this one.  That conclusion is fortified by the reality that while the Court previously noted "the Government's lack of a showing [why] the claim should be dismissed," Mahoney I, 2022 WL 523009, at *9, here Mahoney is the movant and he "must establish . . . that he is likely to succeed on the merits."  Sherley, 644 F.3d at 392 (quoting Winter, 555 U.S. at 20).  By neglecting to address the claim in any detail, he has not carried that burden.  See Fresno Cmty. Hosp. & Med. Ctr. v. Cochran, 987 F.3d 158, 163 (D.C. Cir. 2021) (quoting CTS Corp. v. EPA, 759 F.3d 52, 64 (D.C. Cir. 2014)) ("Footnotes, of course, are 'no place to make a substantive legal argument.'").

Likely failure on each of his counts dooms this Motion.  See Ark. Dairy Co-op, 573 F.3d at 832 (because appellants "have shown no likelihood of success on the merits," "this court need not proceed to review the other three preliminary injunction factors"); Frederick Douglass Found., Inc. v. D.C., 531 F. Supp. 3d 316, 345 (D.D.C. 2021) ("As Plaintiffs have not established a likelihood of success on any of their claims, the Court need not address the remaining preliminary-injunction factors."); Adams v. District of Columbia, 285 F. Supp. 3d

381, 397 (D.D.C. 2018).  That said, the Court believes it also worthwhile to address the

irreparable-harm factor, on which the parties also focus.  See Second Gov. Opp. at 12; ECF No.

13 (Reply) at 11–14.

     B.  Irreparable Harm

     Mahoney contends that "because he will be forced to forgo holding his proposed Good

Friday prayer vigil before the Court can fully resolve his claims, he has established irreparable

harm."  PI Motion at 21.  What that assertion neglects to engage with, however, is that even

without obtaining an injunction, Plaintiff remains free to hold a prayer vigil on Good Friday on

the Capitol Grounds, either on the West Front Lawn with 19 or fewer people, or a stone's throw

away with more attendees.  See Grossi Decl., ¶¶ 18–21.  Indeed, the Board reiterated to Mahoney

that it "would be happy to work with [him] on selecting an alternate location from the available

areas on U.S. Capitol Grounds," id., ¶ 21, and it offered him "the opportunity to relocate his

group to Area 15 for the same day, informing him that Area 15, like Area 1, offers west front

views of the U.S. Capitol."  Id., ¶ 19.  There is no dispute, moreover, that even if an injunction is

not entered, Mahoney can proceed with a prayer vigil in his desired location on the West Front

Lawn (in Area 1) with 19 or fewer people.  Id., ¶ 14.

     In light of that reality — as well as Plaintiff's vague and conclusory allegations of harm

from being forced to trim his vigil or relocate nearby — the Court has doubts that he has

established irreparable harm in the absence of an injunction.  Mahoney's declaration, for

example, makes no concrete reference to precisely how he will be irreparably harmed.  See

Mahoney Decl., ¶¶ 19–21.  As the Court previously explained in the context of discussing why

the Traffic Regulations leave open ample alternative channels of communication, "Plaintiff

remain[s] free to demonstrate with fewer than 20 people in his desired location, and with 20 or

more in most of the numbered areas on the Capitol Grounds.  In fact, some of those areas are across the street from Capitol Square and, like the West Front Lawn, also have prominent views of the Capitol, and Plaintiff offers no substantive reason why they are not of essentially equivalent utility."  Mahoney I, 2022 WL 523009, at *6 (citations omitted).  "Because Plaintiff[] remain[s] 'free to engage in a rich variety of expressive activities' and retain[s] 'a multitude of possibilities for meaningful protest,' it matters not that the [Government] curbed but a single form of such potential expression."  Frederick Douglass Found., Inc., 531 F. Supp. 3d at 338 (quoting White House Vigil for ERA Comm. v. Clark, 746 F.2d 1518, 1528 (D.C. Cir. 1984)); cf. Lederman v. United States, 291 F.3d 36, 46 (D.C. Cir. 2002) (explaining that it likely would be constitutional for the Board to "require permits for demonstrations on the sidewalk [at the foot of the steps on the East Front of the Capitol], limit the duration of such demonstrations, restrict the number of individuals who may demonstrate simultaneously, require that demonstrators present bags and other personal possessions to police officers for screening, or prohibit activities likely to attract large crowds").

Of course, the prior Opinion's analysis focused on whether Mahoney had alleged a plausible First Amendment violation on the merits.  The reasoning nonetheless may well apply with similar force here, as Plaintiff has likely not established how he would be irreparably harmed by holding a vigil in his desired location with 19 people, or at an adjacent site with a larger group.  Ultimately, the Court need not decide this question as he has not demonstrated a likelihood of success on the merits.  See Ark. Dairy Co-op, 573 F.3d at 832.

**IV.     Conclusion**

For the foregoing reasons, the Court will deny Plaintiff's Motion for Preliminary

Injunction.  A separate Order so stating will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: April 5, 2022